```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
```

MARK D. AUSTIN,                :    HONORABLE JOSEPH E. IRENAS
                               :
     Plaintiff,                :    Civil Action No. 06-2147 (JEI)
                               :
     v.                        :
                               :            **OPINION**
JO ANNE B. BARNHART,           :
Commissioner of Social         :
Security,                      :
                               :
     Defendant.                :
                               :


**APPEARANCES:**

JACOBS, SCHWALBE & PETRUZZELLI, P.C.
By: Robert Anthony Petruzzelli, Esq.
Woodcrest Pavilion
Ten Melrose Avenue, Suite 340
Cherry Hill, NJ 08003
     Counsel for Plaintiff

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
By: Som Ramrup, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
     Counsel for Defendant

**Irenas**, Senior District Judge:

   Mark D. Austin ("Austin") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and Section 1634(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), for review of the final determination of the Commissioner of Social Security (the "Commissioner"), denying Austin's application for Social Security Disability Insurance

Benefits and Supplemental Security Income. For the following reasons, this Court affirms the Commissioner's decision.

I.

On May 3, 2004, Austin filed an application with the Social Security Administration (the "SSA") for supplemental security income and disability insurance benefits. (R. at 68-70, 186-90.) He claimed an inability to work as of April 15, 2003. (*Id*.) The SSA denied Austin's claims and, subsequently, denied his request for reconsideration. (R. at 30-35, 37-40, 193-196.)

Austin appealed the denial of his claims and timely requested a hearing on October 6, 2005. (R. at 41.) The hearing was held before an Administrative Law Judge ("ALJ") on November 17, 2005, in Voorhees, New Jersey. (R. at 16, 205-37.) ALJ Christopher K. Bullard issued a decision dated December 6, 2005, holding that Austin "was not under a 'disability' as defined in the Social Security Act, at any time through the date of this decision" and "not entitled to a period of disability, disability insurance benefits, and not eligible for supplemental security income." (R. at 24-25, 291.)

Austin requested review of the ALJ's decision by the Appeals Council of SSA, but his request was denied on April 7, 2006. (R. at 5-9.) ALJ Bullard's decision thus stands as the final decision of the Commissioner. (R. at 5.) Subsequently, Austin timely filed his appeal with this Court on May 12, 2006.

**II.**

Austin is a forty year old male who possesses a tenth grade education. (R. at 17.) At the time of the administrative hearing, Austin was approximately five feet, nine inches tall and weighed approximately two hundred thirty pounds. (R. at 216.) His past relevant work experience includes employment as an auto mechanic and plumber. (R. at 17.)

On his application to the SSA, Austin claimed that he was unable to work since April 15, 2003. (R. at 68, 187.) However, at the administrative hearing, Austin amended the onset date to March 15, 2002.[1] (R. at 209.) Austin contends that he was unable to work since March 15, 2002 because he suffered from depression and severe ankle and leg pain, hip pain, back pain caused by degenerative disc disease. (R. at 210-12, 213, 277.) The record shows that Austin had club feet since childhood and has undergone multiple surgeries on both feet for this condition. (R. at 19, 210.) Austin further recounted that he has had multiple corrective shoes and physical therapies, but the pain and discomfort has been progressive and degenerative over the years. (R. at 210-11.)

The record presents extensive medical documentation

---

[1] Austin amended the onset date after indicating that his work with New Jersey Transit in 2003 was an unsuccessful work attempt and lasted only two to three months due to his impairments. (R. at 209.)

regarding Austin's medical history and conditions.  On September 9, 1996, Austin was examined by South Shore Orthopaedics.  (R. at 19, 168.)  Austin reported that he injured his left foot on September 5, 1996, lifting a truck tire while at work and was taken to the emergency room.  (R. at 168.)  Austin also stated that x-rays revealed a left tarsal navicular fracture.  (*Id.*)  Upon examination, it was noted that Austin had a club foot deformity with restriction of motion.  (*Id.*)  Additional x-rays confirmed a fracture of the left tarsal navicular.  (R. at 171.)  As a result, Austin was placed in a short-leg walking cast.  (R. at 168.)  On November 4, 1996, Austin was re-evaluated wherein x-rays of his ankle showed excellent healing and good position.  (*Id.*)  Thereafter, Austin was discharged from care.  (*Id.*)

On February 12, 2000, Austin visited Burdette Tomlin Hospital Emergency Room and complained of severe left ankle pain after slipping and falling on ice.  (R. at 19, 129-35.)  X-rays of Austin's left ankle revealed degenerative changes and an old injury of the navicular.  (R. at 19, 132.)  Austin was diagnosed with a sprained ankle and degenerative joint disease and prescribed 800mg of Motrin.  (R. at 19, 134.)

On June 3, 2004, Dr. Khone conducted an orthopaedic consultative examination of Austin at the request of the SSA.  (R. at 19.)  Austin told Dr. Khona that he has had club feet since childhood and had multiple surgeries in both feet in regard

4

to this condition.  (R. at 136.)  He further reported that he only wears regular shoes because he has tried various kinds of shoes with inserts, but they have caused him more pain.  (*Id.*)  Additionally, Austin noted that he has constant pain, especially with prolonged standing after one hour, as well as increasing back and hip pain.  (*Id.*)  Finally, Dr. Khona reported that Austin has had severe depression off and on for nearly twenty years, but that he takes no medication and does not undergo psychiatric treatment regarding this condition.  (*Id.*)

During the examination of Austin, Dr. Khona noted that Austin's station and gait were normal.  He used no assistive device for walking, and was able to squat.  (R. at 137.)  Dr. Khona also noted that Austin was not able to walk on his heels or toes.  (*Id.*)  Dr. Khona indicated that Austin had a full range of motion in the shoulders, elbows, forearms, wrists, and fingers bilaterally.  (*Id.*)  However, Austin had decreased range of motion in the ankles, with the right ankle being worse than the left.  (R. at 137-38.)  There was no muscle atrophy, sensory abnormalities, or inflammation.  (R. at 138.)  As a result, Dr. Khona diagnosed Austin with status-post multiple ankle surgeries for club foot, decreased ankle range of motion, and chronic lower back pain.  (R. at 19, 138.)  Dr. Khona noted that Austin had mild limitations for standing and squatting for a prolonged time and was limited in his ability to climb, but was capable of

5

performing sedentary work. (R. at 138.)

Dr. David London, Ph.D., conducted a consultative examination on Austin on June 10, 2004. Austin reported that he worked as mechanic for approximately twenty years, but stopped because he was physically incapable of doing the job. (R. at 141.) Austin further stated that he suffered from depression, which he indicated stems from being "physically incapable" of doing what he was able to do. (*Id*.) Austin also recounted that when he feels depressed, he does not "feel like getting out of bed" and has feelings of "hopelessness" and "helplessness." (*Id*.)

Moreover, Austin had been in a psychiatric hospital three times, most recently in 1985 for about forty days due to attempted suicide, alcoholism, and drug addiction. (R. at 142.) Austin also indicated that he was emotionally, sexually, and physically abused as a child by his family. (*Id*.) However, he stated that he had been "drug free" and sober since 1995. (*Id*.)

Dr. London noted that Austin's grooming, hygiene, and appearance were appropriate, his thinking seemed logical and organized, and he was oriented to time, place, and person. (R. at 142-43.) Dr. London also reported that Austin's mood was sad, his affect was bland, and his short term memory was impaired. (R. at 143.) Dr. London further stated that Austin's capacity for memory, social interaction, and adaptation were severely

impaired. (*Id*.) Consequently, Dr. London diagnosed Austin with mood disorder not otherwise specified, posttraumatic stress disorder, and personality disorder not otherwise specified. (R. at 144.)

On August 16, 2004, Dr. Keith Bopf examined Austin. During the examination, Dr. Bopf's diagnoses were degenerative arthritis of bilateral ankles, subtalar joints and midfoot. (R. at 175.) He prescribed an Arizona type brace which essentially locks the ankle and subtalar joint in place. (*Id*.) Dr. Bopf opined that Austin is not able to "perform any job that requires him to stand more than a hour during the day." (*Id*.) However, Dr. Bopf further noted that Austin should not have a problem performing jobs that require sitting. (*Id*.)

On October 28, 2005, Dr. David Anapolle evaluated Austin after complaints of bilateral foot pain. (R. at 184.) Dr. Annapolle noted that Austin's low back pain has improved and the Arizona braces have stabilized his feet and seem to provide "adequate symptomatic relief". (*Id*.) Dr. Annapolle also reviewed a MRI of Austin's lumbar spine, which was conducted on September 21, 2004, and showed degenerative disc changes at L5-S1 level with disc bulging. (*Id*.) Consequently, Dr. Annapolle diagnosed Austin with severe degenerative joint disease, both in the feet and ankles, and degenerative disc disease, L5-S1. (*Id.*) As a result of these findings, Dr. Annapolle stated that Austin

7

was "precluded on a permanent basis from returning to any work activities which would require any significant standing, walking, climbing, lifting, etc." (*Id.*)

At the administrative hearing, Austin testified that he suffers from constant pain in his ankles and feet. (R. at 20, 210-11.) He also stated that could stand for about forty-five minutes at a time, walk about two blocks, and can lift and carry a bag of groceries while utilizing the Arizona braces prescribed by Dr. Bopf. (R. at 20, 221-22.) Austin acknowledged that he had difficulty being in an automobile for an extended amount of time because of stiffness in his legs and problems with his back. (R. at 215.) He also testified that he stopped grocery shopping due to the discomfort and pain that resulted from walking around. (*Id.*) Moreover, he stated that he was treated for depression, approximately four years ago, for about one and a half years by a psychiatrist, but that he was released from treatment and no longer takes medication for the condition. (R. at 20.)

### III.

This Court reviews the decision of the ALJ to determine whether substantial evidence on the record supports the ALJ's decision. *See* 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)). Any finding of fact made by the ALJ shall be

conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate." *Plummer*, 186 F.3d at 427.

### IV.

### A.

The SSA uses a five-step sequential evaluation process to determine whether an individual is disabled. 20 C.F.R. § 404.1520. In *Plummer v. Apfel*, the Third Circuit described the five-step evaluation:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

9

> At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. *See* § 404.1523.

*Plummer*, 186 F.3d at 428. If a determination about a claimant's disability can be made at any step in the sequential evaluation, the analysis is concluded without continuing on to any remaining steps. 20 C.F.R. § 404.1520(a)(4).

**B.**

ALJ Bullard held that Austin was "not under a disability, as defined by the Social Security Act, at any time through the date of this decision [December 6, 2005]." (R. at 24.) The ALJ also concluded that Austin was not entitled to a period of disability, disability insurance benefits, and not eligible for supplemental security income under Sections 216(I), 223, 1602, and 1614(a)(3)(A) of the Act. (R. at 25.) This determination was reached after proceeding through five steps of the sequential evaluation. Upon review of the record, this Court concludes that the ALJ's findings are supported by substantial evidence as required by Section 405(g) and *Plummer*.

In the first step, the ALJ found that Austin had not engaged

10

in substantial gainful activity after March 15, 2002. (R. at 17-18, 24.)  In the second step, the ALJ determined that Austin was severely impaired as a result of the following medical conditions: club feet, degenerative disc disease, degenerative joint disease, depressive disorder, post traumatic stress disorder, and personality disorder. (R. at 18.)  Austin does not dispute these findings.

In the third step, the ALJ found that Austin's impairments were "not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements . . . in the Listing of Impairments" as set forth in 20 C.F.R. § 404, Subpt. P, App. 1. (R. at 18.)  He noted that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (*Id*.)  Guided by his opinion dated December 6, 2005, ALJ Bullard held that Austin's impairments do not meet or equal a Listing because the medical evidence in the record did not support that conclusion. (*Id*.)  Additionally, ALJ Bullard noted that he "considered the opinion of the State Agency medical consultants who evaluated the initial and reconsideration levels of the review process" and concluded that Austin's impairments do not meet or equal a listing. (*Id.*)

Austin argues that the ALJ improperly considered the evidence regarding his impairments and erroneously found that his

11

impairments neither met nor equaled Listing 1.02, Major Dysfunction of a Joint(s) or Listing 1.04, Disorders of the Spine.  Additionally, Austin argues that the ALJ failed to properly consider his obesity and the extent of its effect upon his orthopaedic impairments.[2]

In his opinion, the ALJ considered the totality of all the medical and non-medical evidence in the record and conducted a comprehensive analysis of the same in determining that Austin's impairment did not meet or equal the criteria for Listings 1.02 and 1.04.  With regard to Listing 1.02, Austin had to establish that he could not ambulate effectively.  20 C.F.R. § 404, Subpt. P, App. 1, § 1.02.  "Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of hand-held assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. § 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).

The medical evidence of record fails to demonstrate that Austin's club feet meet or equal Listing 1.02.  Specifically, Dr. Khona noted that Austin ambulated without the use of an assistive device or hand held device.  (R. at 137.)  In fact, Dr. Khona found a full range of motion in Austin's upper extremities, shoulders, elbows, forearms, wrists and the fingers.  (*Id.*)

---

[2]Austin does not dispute that his mental impairments did not meet or equal Listing 12.00, Mental Disorders.

Additionally, Austin was prescribed Arizona braces by Dr. Bopf in August, 2004, which provided "adequate symptomatic relief" for Austin's limited activities of daily living.  (R. at 184.)  Moreover, Austin has failed to produce evidence that both of his upper extremities were limited due to the use of hand-held assistive devices, as required by Listing 1.02.  As a result, the ALJ's finding that Austin's impairments did not meet or equal Listing 1.02 is supported by substantial evidence.

The ALJ's determination that Austin did not meet or equal the criteria for Listing 1.04 is also supported by substantial evidence.  A MRI taken in September 2004 indicated that Austin had bulging discs at L5-S1, L3-L4, and L4-L5 levels, but there was no evidence of disc herniation or spinal stenosis.  (R. at 180.)  Dr. Khona noted in his examination that Austin had full muscle strength in his lower extremities and there were no signs of muscle atrophy.  (R. at 137.)  In examining these findings, the ALJ noted that signs of muscle wasting or atrophy are usually observed when back pain is severe and functionally limiting.  (R. at 21.)  Additionally, Dr. Annapolle diagnosed Austin with degenerative disc disease at L5-S1 and indicated that Austin's symptoms were tolerable as long as he avoided bending and lifting activities and that no further treatment was recommended.  (R. at 184-85.)  Thus, there is no medical evidence supporting Austin's claim that he met or equaled Listing 1.04 and, therefore,

substantial evidence supports the ALJ's determination.

Austin's argument that the ALJ failed to consider his obesity is likewise flawed. The ALJ specifically stated that he considered the entire record including all of the medical treatment required, the reports of the treating and examining practitioners, and Austin's medical history. (R. at 21.) Austin's treating physicians and the consultative examiner were well aware of Austin's obesity. Moreover, Austin does not specify how his obesity impairs his ability to work. Consequently, the medical treatment evidence in the record, which considered Austin's obesity, supports the ALJ's decision and the ALJ's failure to specifically mention Austin's obesity was not error because he considered all of the evidence of record.

Moreover, Austin has offered no other evidence that suggests that his combined impairments would be medically equivalent to a listed impairment. *Ballardo v. Barhart*, 68 F. App'x 337, 338 (3d Cir. 2003) ("However, a claimant bears the burden of producing evidence that her impairment is equivalent to a listed impairment, and equivalence to a listed impairment must be determined on the basis of medical findings 'supported by medically acceptable clinical and laboratory techniques.'")(citations omitted).

Next, the ALJ performed an extensive analysis of the medical reports and other relevant documentation contained within the

record to determine Austin's residual functional capacity.[3] Specifically, the ALJ reviewed the medical evaluations and psychological reports generated by Dr. Khona, Dr. London, Dr. Bopf, Dr. Annapolle, and Austin's testimony.  (R. at 18-21.)  The reports of these physicians and general medical practitioners addressed Austin's club feet, degenerative disc disease, degenerative joint disease, depressive disorder, post traumatic stress disorder, and personality disorder. (*Id*.)  Based on his analysis of this evidence, the ALJ found that Austin retained the residual functional capacity as follows:

> lift and carry up to twenty pounds occasionally and ten pounds frequently, has no restrictions with sitting, can stand for about two hours (in thirty minute intervals), walk for about one hour (in fifteen minute intervals) and can occasionally climb stairs, balance, and stoop, but cannot climb ladders, and can understand, remember and carryout simple instructions and perform simple, repetitive task.

(R. at 22.)  The ALJ determined that this residual functional capacity was sufficient to permit Austin to perform a significant range of sedentary work[4].  (R. at 24.)

Austin argues that the ALJ failed to properly determine his

---

[3] "Residual functional capacity" is defined as the most that an individual can still do in a work setting despite any physical or mental limitations. 20 C.F.R. § 404.1545(a).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

residual functional capacity. Specifically, he contends that the ALJ failed to properly weigh the medical evidence.

In determining Austin's residual functional capacity, the ALJ relied not only the medical evidence in the administrative record, but also Austin's credibility. The medical evidence in this case supports the ALJ's finding with respect to Austin's residual functional capacity. As previously indicated, the ALJ indicated that he considered the "entire record" in determining Austin's residual functional capacity. (R. at 22.)

Dr. Khona's examination revealed that Austin had normal gait and station and did not use any assistive devices for walking. (R. at 137.) Dr. Khona also noted that Austin had a full range of motion in his cervical spine, lumbar spine, and upper extremities. (*Id.*) Furthermore, Dr. Khona indicated that no muscle atrophy was noted and that Austin's muscle strength was five out of five in the upper and lower extremities. (*Id.*) As a result, Dr. Khona concluded that Austin would have mild limitations with prolonged standing, squatting, and with his ability to climb, but that Austin was trainable and capable of sedentary work. (R. at 138.)

The opinions of Austin's other treating physicians also do not preclude all work activity. Specifically, in September 2004, Dr. Annapolle noted that Austin was unable to return to work "in construction". (R. at 182.) In October 2005, Dr. Annapolle

further noted that Austin would be precluded from performing any work activities that require "any significant standing, walking, climbing, lifting, etc." (R. at 184.)  In making this assessment, Dr. Khona stated that activity modification and use of "his supportive braces had led to satisfactory relief" of Austin's symptoms. (*Id.*)  Additionally, Dr. Bopf opined in October 2005 that Austin would not be able to perform work that required "him to stand for more than an hour during the day or require any significant walking." (R. at 183.)

Regarding Austin's mental impairments and their impact upon his residual functional capacity, the ALJ relied on the testimony of Dr. Richard Cohen and Dr. London.  Specifically, Dr. Cohen, a medical expert in psychiatry, testified at the administrative hearing that Austin's major limitations were orthopaedic, not psychiatric and that Austin was able to perform simple, repetitive tasks, and probably more. (R. at 21.)  Dr. London reported that Austin's thinking was logical and organized and that his concentration, attention, and intermediate and long term memory skills were functional. (R. at 142-43.)

Furthermore, the ALJ determined that Austin's statements regarding his impairments and their impact on his ability to work were not persuasive. (R. at 21.)  He noted that in regard to the degree of medical treatment required, the reports of the treating and examining physicians, and the findings made upon examination

17

of Austin that there were discrepancies between Austin's assertions and the information derived from the physicians. (*Id.*)

In step four, the ALJ concluded that Austin was unable to perform his past relevant work due to the determination of his residual functional capacity. (R. at 24.)  At the administrative hearing, Mitchell Schmidt, a vocational expert, testified that Austin's employment as a full hose attendant, dump truck driver, auto mechanic, bus inspector, and painter were all "medium" in their exertional capacity, that his jobs as an auto mechanic, bus inspector, and painter were "skilled, and the rest of the jobs were "unskilled."  (R. at 22.)  Therefore, Schmidt opined, based on a hypothetical person possessing Austin's residual functional capacity, an individual could not return to any of these prior jobs.  (*Id.*)  However, Schmidt indicated that such a person could perform work as a food and beverage order clerk, an addresser, or surveillance system monitor.  (*Id.*)

At step five, the ALJ examined the cumulative effects of Austin's impairments, age, educational background, work experience, residual functioning capacity in accordance with the Medical-Vocational Guidelines.  Incorporating all of these factors, the ALJ determined that Austin was capable of performing a significant range of sedentary work and is not disabled. (R. at 23-24.)  Specifically, the ALJ deduced that "using Medical-

Vocational Rule 202.25 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as food and beverage sales clerk, addresser, and surveillance system monitor." (R. at 24.)

Austin argues that the jobs identified by the vocational expert are inconsistent with general education development ("GED") requirements stated in the Dictionary of Occupational Titles.  The ALJ properly fulfilled his limited burden at step five of the evaluation by utilizing the services of a vocational expert, Mitchell Schmidt.  The ALJ's hypothetical to Schmidt reflected all of Austin's credible mental and physical functional limitations as supported by the record.  Thereafter, Schmidt identified the jobs that could accommodate Austin's mental and physical limitations, which included work that was simple and repetitive and which only required simple instructions.  (R. at 234.)  These jobs included addresser, food and beverage order clerk, and surveillance system monitor.  (R. at 234-35.)

Based on the Dictionary of Occupational Titles, the jobs identified by the vocational expert only require a level of reasoning obtained in no more than grade school and require less than thirty days to learn.  Austin, on the other hand, possesses a tenth grade education and maintained a skilled job for a number of years.  (R. at 80, 85).  Even though the ALJ found that Austin

19

was limited to simple, repetitive work, there is no evidence in the record to suggest that Austin suffers from any brain dysfunction that would cause a reduction in the educational achievements that Austin had already acquired.  Thus, the ALJ's determination, based on the testimony of the vocational expert, that Austin retained the ability to perform a number of jobs which existed in significant numbers in the economy was supported by substantial evidence and does not conflict with the Dictionary of Occupational Titles.

Accordingly, this Court finds that the ALJ's decision was supported by substantial evidence.

**V.**

For the aforementioned reasons, the Court will affirm the final decision of the Commissioner denying Austin's application for disability benefits and supplemental security income.  The Court will issue an appropriate order.

Date: April 23, 2006

                                                  _s/Joseph E. Irenas_
                                                  JOSEPH E. IRENAS, S.U.S.D.J.